The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 22, 2019

**2019COA128**

**No. 18CA1275, *Pro's Closet v. City of Boulder* — Local Government — Pawnbrokers**

A division of the court of appeals interprets the definition of "pawnbroker" in section 29-11.9-101(7), C.R.S. 2018, and holds that it includes persons regularly engaged in making "purchase transactions," as that term is defined in section 29-11.9-101(8), and not just persons regularly engaged in making "contracts for purchase," as that term is defined in section 29-11.9-101(1), who also make purchase transactions.

COLORADO COURT OF APPEALS          **2019COA128**

Court of Appeals No. 18CA1275
Boulder County District Court No. 17CV30652
Honorable Patrick Butler, Judge

The Pro's Closet, Inc., a Delaware corporation,

Plaintiff-Appellant,

v.

City of Boulder, Colorado, and Michael Dougherty, in his official capacity as the District Attorney for the 20th Judicial District of Colorado,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE J. JONES
Román and Lipinsky, JJ., concur

Announced August 22, 2019

LaszloLaw, Theodore E. Laszlo, Jr., Michael J. Laszlo, Boulder, Colorado; Sean Connelly, Denver, Colorado, for Plaintiff-Appellant

Thomas A. Carr, City Attorney, Luis Toro, Senior Assistant City Attorney, Boulder, Colorado, for Defendant-Appellee City of Boulder

Ben Perlman, County Attorney, David Hughes, Deputy County Attorney, Catherine R. Ruhland, Assistant County Attorney, Boulder, Colorado, for Defendant-Appellee Michael Dougherty

¶ 1    Plaintiff, The Pro's Closet, Inc., appeals the district court's summary judgment in favor of defendant, the City of Boulder. The court ruled that Pro's Closet is a "pawnbroker" as defined in section 29-11.9-101, C.R.S. 2018, and is therefore subject to the requirements, restrictions, and potential sanctions of the state pawnbroker laws, sections 29-11.9-101 to -104, C.R.S. 2018. Because we conclude that the district court didn't err in interpreting the pawnbroker statutes, we affirm the judgment.

## I.    Background

¶ 2    Pro's Closet is licensed in Boulder as a secondhand dealer under the Boulder Revised Code. It sells used bicycles, bicycle parts, and bicycle gear. Though it has a warehouse in Boulder, Pro's Closet does most of its business online.

¶ 3    In 2016, the Twentieth Judicial District's District Attorney's Office told the Boulder Police Department to treat Pro's Closet as a "pawnbroker" under state law, meaning, among other things, that Pro's Closet must hold used goods it buys for thirty days before reselling them instead of ninety-six hours as required by the Boulder Revised Code's secondhand dealer ordinances. *See* § 29-11.9-103(6), C.R.S. 2018; Boulder Rev. Code 4-17-10. Pro's Closet

1

filed suit, seeking a declaratory judgment that it isn't subject to state pawnbroker laws.

¶ 4 Both Pro's Closet and the City moved for summary judgment. The district court granted the City's motion, concluding that, since Pro's Closet regularly makes "purchase transaction[s]" as defined by section 29-11.9-101(8), it is a pawnbroker under state law.

## II. Discussion

¶ 5 Pro's Closet argues on appeal that (1) the district court erred in ruling that it is a pawnbroker under section 29-11.9-101; and (2) because Colorado's and the City's secondhand dealer laws are more specific to its business, it isn't subject to state pawnbroker laws.[1] We reject both arguments.

### A. Pro's Closet is a Pawnbroker Under State Law

¶ 6 Pro's Closet argues first that the district court incorrectly interpreted section 29-11.9-101 in concluding that it is a "pawnbroker."

---

[1] Pro's Closet asserted four more arguments in its opening and reply briefs, but later withdrew them.

### 1.    Standard of Review and Interpretive Principles

¶ 7    We review issues of statutory interpretation de novo.  *Colo. Oil & Gas Conservation Comm'n v. Martinez*, 2019 CO 3, ¶ 19.

¶ 8    In construing a statute, we look to the entire statutory scheme to give consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings.  *Id.*; *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1088-89 (Colo. 2011).  When the statutory language is clear, we apply it as written, without resorting to other principles of statutory interpretation.  *Martinez*, ¶ 19; *Denver Post Corp.*, 255 P.3d at 1088.

### 2.    Analysis

¶ 9    Article 11.9 of title 29 of the Colorado Revised Statutes regulates certain activities of "pawnbrokers."  §§ 29-11.9-101 to -104.  It both requires and prohibits specified acts by pawnbrokers, §§ 29-11.9-103, -104, and it creates criminal penalties for noncompliance, § 29-11.9-104(3)(b), (4).[2]  The required

---

[2] The pawnbroker statutes also allow for local licensing and regulation of pawnbrokers, subject to limitations, § 29-11.9-102, C.R.S. 2018, and dictate a criminal penalty for any customer who knowingly gives certain kinds of false information to a pawnbroker, § 29-11.9-104(5), C.R.S. 2018.

3

act that Pro's Closet apparently considers the most onerous is the requirement to "hold all property purchased by [the pawnbroker] through a purchase transaction for thirty days following the date of purchase . . . ." § 29-11.9-103(6).

¶ 10    Section 29-11.9-101(7) defines a "pawnbroker" as "a person regularly engaged in the business of making contracts for purchase *or* purchase transactions in the course of his or her business." (Emphasis added.)  Section 29-11.9-101(1) defines a "contract for purchase" as

> a contract entered into between a pawnbroker and a customer pursuant to which money is advanced to the customer by the pawnbroker on the delivery of tangible personal property by the customer on the condition that the customer, for a fixed price and within a fixed period of time, to be no less than thirty days, has the option to cancel said contract.

And section 29-11.9-101(8) defines a "purchase transaction" as

> the purchase by a pawnbroker in the course of his or her business of tangible personal property for resale, other than newly manufactured tangible personal property that has not previously been sold at retail, when the purchase does not constitute a contract for purchase.

4

¶ 11    The City doesn't claim that Pro's Closet makes "contracts for purchase"; it claims that Pro's Closet regularly engages in the business of making "purchase transactions," as that term is statutorily defined.  For its part, Pro's Closet doesn't dispute that it regularly makes purchase transactions.  Instead, it argues that to be a "pawnbroker" under the state statutes, a person or business must regularly make contracts for purchase.  A business that makes purchase transactions only counts as a "pawnbroker," Pro's Closet says, if its primary business is making contracts for purchase.

¶ 12    Pro's Closet's reading of the definitional statute is untenable.  Giving the language in that statute its plain and ordinary meaning — that is, applying well-established rules of grammar and the common understanding of the words' usage — we conclude that section 29-11.9-101(7) expressly provides two alternative means of qualifying as a "pawnbroker."  *See* § 2-4-101, C.R.S. 2018 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," unless they have otherwise "acquired a technical or particular meaning.").  It does so by articulating those means — regularly making contracts for

purchase or regularly making purchase transactions — in the disjunctive by use of the word "or." *See Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 571 (Colo. 2008) ("Generally, we presume the disjunctive use of the word 'or' marks distinctive categories."); *Bloomer v. Bd. of Cty. Comm'rs*, 799 P.2d 942, 946 (Colo. 1990) ("The legislature's use of the disjunctive 'or' demarcates different categories."), *overruled on other grounds by Bertrand v. Bd. of Cty. Comm'rs*, 872 P.2d 223 (Colo. 1994). A "pawnbroker" within the meaning of section 29-11.9-101(1), (7), (8) is therefore an entity that regularly engages *either* in the business of making contracts for purchase or in the business of making purchase transactions.

¶ 13     It is undisputed that Pro's Closet regularly engages in the business of making purchase transactions. It is therefore a "pawnbroker" under state law.

¶ 14     Pro's Closet's proposed interpretation of "pawnbroker" — that only businesses that regularly make contracts for purchase qualify — fails for two main reasons. First, accepting it would require us to contravene the principle that a court must give sensible effect to *all* parts of a statute. § 2-4-201(1)(b), C.R.S. 2018 (court must presume the General Assembly intended all parts of a statute to be

6

effective); *Martinez,* ¶ 19.  After all, if, as Pro's Closet argues, a business must regularly make contracts for purchase to be a "pawnbroker," then the General Assembly would have had no reason to include the phrase "or purchase transactions" in subsection 101(7)'s definition of a "pawnbroker": businesses regularly engaged in making contracts for purchase but that also regularly make purchase transactions would be a mere subset of businesses regularly engaged in making contracts for purchase.[3] Put a bit differently, every business that regularly makes contracts for purchase qualifies as a "pawnbroker" under subsection 101(1), regardless of whether it also makes purchase transactions: saying, as Pro's Closet proposes, that "pawnbroker" only includes businesses that regularly make contracts for purchase, including those that also make purchase transactions, is no different, in

[3] Pro's Closet's position can be expressed in an algebraic form as follows: a (regularly making contracts for purchase, *see* § 29-11.9-101(1), C.R.S. 2018) = x (pawnbroker); and a (regularly making contracts for purchase, *see* § 29-11.9-101(1)) + b (regularly making purchase transactions, *see* § 29-11.9-101(8)) = x (pawnbroker); but b (regularly making purchase transactions, *see* § 29-11.9-101(8)) ≠ x (pawnbroker).  Another way to conceptualize Pro's Closet's position as contrasted with our interpretation — in terms of sets and subsets — is shown in Appendix A to this opinion.

7

terms of defining covered entities, from saying "pawnbroker" includes only businesses that regularly make contracts for purchase. So Pro's Closet's proposed interpretation impermissibly renders the last phrase of subsection 101(7) — "or purchase transactions in the course of his or her business" — and all of subsection 101(8) — defining a "purchase transaction" — superfluous. *Kinder Morgan CO2 Co., L.P. v. Montezuma Cty. Bd. of Comm'rs*, 2017 CO 72, ¶ 24 (we must strive to avoid any interpretation that would render words or phrases superfluous).

¶ 15    Second, Pro's Closet's position is inconsistent with and would undermine certain purposes of the pawnbroker statutes, as reflected in the entire statutory scheme. *Martinez*, ¶ 19 (we must consider the entire statutory scheme when discerning legislative intent). Those purposes include enabling law enforcement to track and recover stolen tangible personal property and assisting law enforcement officials in apprehending those trafficking in stolen tangible personal property. To those ends, the statutes imposing record-keeping, holding, and other related requirements apply expressly, and largely to the same extent, to both property held via contracts for purchase and property obtained via purchase

8

transactions.  § 29-11.9-103(1)-(7); § 29-11.9-104(1).  Pro's Closet hasn't explained why the General Assembly would want to exempt from this scheme that category of persons regularly engaged in making purchase transactions who aren't primarily in the business of making contracts for purchase.  *See Metal Mgmt. W., Inc. v. State*, 251 P.3d 1164, 1173 (Colo. App. 2010) (rejecting a proposed limitation on the meaning of a statutory term because doing so would "undermine the legislature's intent and defeat the purpose of the statute").

¶ 16     Our interpretation of the definitional statute also finds support in its history, particularly when considered in light of other states' pawnbroker laws.  The General Assembly enacted the first version of Colorado's pawnbroker-regulating statutes in 1897.  *See* Ch. 66, 1897 Colo. Sess. Laws 250.  It initially defined "pawnbroker" as "[a]ny person or persons loaning money on personal property and charging as much as the maximum rate of interest herein provided . . . ."  Ch. 66, sec. 16, 1897 Colo. Sess. Laws 254.  Save for the interest rate aspect, that definition tracked in substance the traditional understanding of pawnbroker, as now reflected in subsection 101(1)'s definition of "contract for purchase."  And that

9

definition remained unchanged, *see* § 12-56-101, C.R.S. 1978, until 1984 when the General Assembly repealed the existing statutes and replaced them with the substantially amended versions applicable today. *See* §§ 12-56-101 to -104, C.R.S. 1984; Ch. 246, sec. 3, 2017 Colo. Sess. Laws 1038-41 (relocating the statutes to title 29, article 11.9). In doing so, the General Assembly abandoned the old unitary definition of a pawnbroker, which, again, was in line with the traditional understanding of the term, and replaced it with a plainly more expansive, disjunctively phrased definition. Had the General Assembly wished to keep the traditional understanding, its amendment to the definition, if any, would have looked much different.

¶ 17    This latter point is further borne out by comparing the current definition of "pawnbroker" in subsection 101(7) with those that appear in other states' pawnbroker statutes, most of which have been on the books for many decades. Almost every state, as well as the District of Columbia, has laws regulating pawnbrokers. Their definitions of pawnbroker can be sorted into three broad categories. First, a few states' statutes limit their definitions to the traditional understanding — a person who lends money in exchange for a

10

pledge of personal property.  *E.g.*, Alaska Stat. § 08.76.590(21)-(23) (2018); Nev. Rev. Stat. § 646.010 (2017); R.I. Gen. Laws § 19-26-1 (2018).  Second, many states' statutes, perhaps in the service of loophole closing, include not just persons who lend money secured by personal property, but also persons who buy personal property on the condition that the seller may buy back the property for a stipulated price within a fixed or variable period of time.  *E.g.*, Ala. Code § 5-19A-2(4) (2019); Ariz. Rev. Stat. Ann. § 44-1621 (2019); 205 Ill. Comp. Stat. 510/1 (2019); Minn. Stat. § 325J.01 (2018); Mo. Rev. Stat. § 367.011(3) (2018); Va. Code Ann. § 54.1-4000 (2019).[4]  Third, some states' statutes, in addition to covering those who lend money on pledged personal property, or sometimes also in addition to covering those who buy personal property subject to the seller's right to buy it back, also cover other specific persons, such as those who hold themselves out as pawnbrokers (usually via signage) or who warehouse furniture and lend money on pledge of

[4] For those wondering whether this category might track "purchase transactions" under Colorado law, we observe that Colorado's definition of "purchase transaction" isn't limited to transactions where the seller has the right to buy back the property for a stipulated price within a fixed or variable period of time.  We think the lack of any such limitation is significant.

goods. *E.g.*, Fla. Stat. § 539.001(2)(h), (i) (2018); Ky. Rev. Stat. Ann. § 45:22-1 (West 2019); Utah Code Ann. § 13-32a-102(22), (23) (West 2019); Vt. Stat. Ann. tit. 9, § 3861 (2018).

¶ 18    Colorado's definition of "pawnbroker" is unlike any of those: it is unique. The General Assembly certainly had a lot of material from other jurisdictions from which it could have drawn in 1984, but it decided to go its own way.

¶ 19    Undaunted, Pro's Closet's argues that its interpretation is warranted for two reasons, both of which we reject.

¶ 20    Pro's Closet asserts that the language "when the purchase does not constitute a contract for purchase" in subsection 101(8)'s definition of "purchase transaction" evinces an intent to limit "pawnbrokers" to those primarily engaged in the business of making contracts for purchase. But that phrase obviously serves to further distinguish contracts for purchase and purchase transactions: if a transaction meets the definition of contract for purchase, then that's what it is; if it doesn't, then it may be a purchase transaction.

¶ 21    Pro's Closet also points to the use of the term "pawnbroker" in subsection 101(8). It argues that to cure a circularity in the

12

definition of "pawnbroker" created when subsections 101(7) and 101(8) are read together, "pawnbroker," as used in subsection 101(8), must be given its commonly understood meaning — that is, the one reflected in subsection 101(1). *See Pub. Serv. Co. of Colo. v. Dep't of Revenue*, 397 P.3d 1111, 1117 (Colo. App. 2011) ("When a definition uses the term being defined, or a synonym, as the definition it is circular and provides little guidance."), *rev'd on other grounds*, 2014 CO 59. But, as discussed, doing that would in turn render subsection 101(8), as well as the last phrase of subsection 101(7), meaningless. Again, if only persons who qualify as "pawnbrokers" under subsection 101(1) are "pawnbrokers" under subsection 101(7), the last phrase of subsection 101(7) and all of subsection 101(8) do no work.

¶ 22    As well, Pro's Closet's proposed fix for the potential partial circularity merely substitutes one oddity for another. For if the commonly understood meaning of pawnbroker (as opposed to the statutory definition) must be given to "pawnbroker" in subsection 101(8), it follows that it must also be given to "pawnbroker" in subsection 101(1). And that would render the definition of "contract for purchase" in that subsection internally repetitive. As

13

Pro's Closet concedes, subsection 101(1), as written, describes

transactions ordinarily considered pawnbroker transactions —

those where a person lends money in exchange for personal

property that is deposited as security by the borrower, and which

property the lender may sell if the borrower fails to repay the loan

by a certain time.  *See* Black's Law Dictionary 1362 (11th ed. 2019);

*see also* Webster's Third New International Dictionary 1658 (2002).

To superimpose that commonly understood meaning of pawnbroker

on the term "pawnbroker" in that subsection would result in the

following reading of subsection 101(1):

> "Contract for purchase" means a contract
> entered into between [one who lends money in
> exchange for personal property that is
> deposited as security by the borrower, and
> which the lender may sell if the borrower fails
> to repay the loan by a certain time] and a
> customer pursuant to which money is
> advanced to the customer by the [one who
> lends money in exchange for personal property
> that is deposited as a security by the borrower,
> and which the lender may sell if the borrower
> fails to repay the loan by a certain time] on the
> delivery of tangible personal property by the
> customer on the condition that the customer,
> for a fixed price and within a fixed period of

time, to be no less than thirty days,[5] has the
option to cancel said contract.

¶ 23    The definition would therefore end with one description of a

pawnbroker transaction on top of a virtually identical description.

We see no reason to believe the General Assembly intended such

redundancy, nor, as previously discussed, do we see any reason the

General Assembly would have intended to use "pawnbroker" in

subsection 101(8) in a way that, considered in connection with

subsections 101(7) and 101(1), renders subsection 101(8) and the

last phrase of subsection 101(7) of no effect.  A more sensible

reading of "pawnbroker" in subsections 101(1) and 101(8) is a

"person" who regularly enters into the described transactions.  This

is so because (1) subsection 101(7) — defining "pawnbroker" —

defines a "pawnbroker" as "a person" who regularly makes either of

two types of transactions; and (2) reading the term as Pro's Closet

proposes creates the problems identified above.  *See Martinez*, ¶ 19

---

[5] The phrase "to be no less than thirty days" is seemingly intended
to limit the definition to be consistent with the holding requirement
of section 29-11.9-103(6), C.R.S. 2018.  It doesn't pertain to the
nature of the covered transactions.

15

(we must strive to give harmonious and sensible effect to all parts of a statute).

¶ 24    Lastly, we reject Pro's Closet's argument that our interpretation will lead to absurd results.  Pro's Closet says this is so because the statutes will have very broad application.  But it is a mistake to equate breadth with absurdity.  To be sure, reading a term broadly may, in a particular situation, lead to an absurd result.  But such a result isn't the inevitable result of any interpretation that can be characterized as broad.  Because breadth is a relative concept, whether a broad construction of a statute would lead to an absurd result necessarily depends on an analysis of the particular circumstances in which it could apply in light of the statutory objectives.  Undertaking such an analysis here, we see no absurdity arising from our enforcement of the unambiguous definition of "pawnbroker."  *See Oracle Corp. v. Dep't of Revenue*, 2017 COA 152, ¶ 40 ("An absurd result is one 'so irrational, unnatural, or inconvenient that it cannot be supposed to have been within the intention of persons with ordinary intelligence and discretion.'" (quoting *Evans Withycombe, Inc. v. W. Innovations, Inc.*, 159 P.3d 547, 550 (Ariz. Ct. App. 2006))), *aff'd*, 2019 CO 42; *see*

16

*also Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1191 (Colo. 2010) ("The rule that we will deviate from the plain language of a statute to avoid an absurd result must be reserved for those instances where a literal interpretation of a statute would produce a result contrary to the expressed intent of the legislature.").

¶ 25    To be sure, the potential scope of the statutes' application gives us some pause. But we must enforce the statutes as written. To the extent the result of doing so may be perceived by some as undesirable, "the legislature must determine the remedy. Courts may not rewrite statutes to improve them." *Dep't of Transp. v. City of Idaho Springs*, 192 P.3d 490, 494 (Colo. App. 2008) (citation omitted); *accord Smith*, 230 P.3d at 1191 ("Where a statute leads to undesirable results, it is up to the General Assembly, not the courts, to determine the remedy.").[6]

---

[6] At oral argument, Pro's Closet's counsel sought to argue, for the first time in this case, that the phrase "in the course of his or her business" in subsections 101(7) and 101(8) somehow indicates that the General Assembly intended that only businesses that are primarily engaged in making contracts for purchase, *see* § 29-11.9-101(1), be regarded as pawnbrokers. We don't address arguments raised for the first time at oral argument. *McGihon v. Cave*, 2016 COA 78, ¶ 10 n.1. But even if we are wrong about whether Pro's Closet preserved this argument, we reject it. We don't see anything

17

## B. The Secondhand Dealer Statutes Do Not Prevail Over the Pawnbroker Statutes

¶ 26    Pro's Closet also contends that Colorado's secondhand dealer statutes, sections 18-13-114 and -118, C.R.S. 2018, trump the pawnbroker statutes because they are more specifically applicable to Pro's Closet's business.

### 1. Standard of Review and Governing Law

¶ 27    Again, we review issues of statutory construction de novo. *Martinez,* ¶ 19.

¶ 28    "[I]n the event of irreconcilable conflict, specific provisions trump general provisions." *Colo. Mining Ass'n v. Bd. of Cty. Comm'rs,* 199 P.3d 718, 733 (Colo. 2009); *see also* § 2-4-205, C.R.S. 2018; *Delta Sales Yard v. Patten,* 892 P.2d 297, 298 (Colo. 1995) ("It is a well-accepted principle of statutory construction that in the case of conflict, a more specific statute controls over a more general one.").

---

in that language, considered in the context of the other relevant parts of section 101, that affects our analysis.  The natural reading of that phrase is that it distinguishes transactions entered into in the course of a person's business from those entered into by a person (who may be a pawnbroker) acting in his personal capacity.

## 2. Analysis

¶ 29 The secondhand dealer statutes that Pro's Closet cites criminalize certain conduct with respect to the sale of secondhand property in Colorado. A secondhand dealer[7] must record certain sales or trades it makes. § 18-13-114(1). It must then provide that record to local law enforcement officials and keep a copy of the record for inspection. *Id.* A first-time violation of these requirements is a class 1 misdemeanor; a subsequent violation within three years of the conviction for the first offense is punishable as a class 5 felony. § 18-13-114(6)(a).

¶ 30 We see no conflict between the record-keeping requirements for secondhand dealers in the criminal code and the record-keeping and holding requirements for pawnbrokers in title 29. Nor has Pro's Closet shown how following one set of laws impacts a

---

[7] A "secondhand dealer" is "any person whose principal business is that of engaging in selling or trading secondhand property." § 18-13-114(5)(c), C.R.S. 2018. That definition doesn't exclude persons who may also be pawnbrokers. *Cf.* Conn. Gen. Stat. § 21-39a(3) (2019) (defining "secondhand dealer" expressly to exclude pawnbrokers); Utah Code Ann. § 13-32a-102(29) (West 2019) (same).

19

business's ability to follow the other.[8]  We therefore see no conflict that would trigger the canon of statutory construction on which Pro's Closet relies.

### III.   Conclusion

¶ 31    We affirm the district court's judgment.

JUDGE ROMÁN and JUDGE LIPINSKY concur.

---

[8] Pro's Closet also argues that the pawnbroker statutes conflict with the City's secondhand dealer ordinances.  But it cites no authority for the proposition that such a conflict renders a state statute a nullity, either generally or as applied to particular persons.

20

APPENDIX A

Pro's Closet's Proposed Interpretation



The shaded area represents Pro's Closet's position as to who qualifies as a "pawnbroker" under subsection 101(7).

Our Interpretation



The shaded area represents our interpretation of the meaning of "pawnbroker" under subsection 101(7).

21